JAQUES *vs.* THE PUBLIC ADMINISTRATOR.

*In the matter of the application for Letters of Administration on the Estate of* JOHN BRAUTIGAM, *deceased.*

WHETHER at Common Law, or by the law of this State, a private contract of marriage *per verba de præsenti*, without cohabitation, constitutes a valid marriage.—*Quære.*

The form of a private contract of marriage with a lunatic, without cohabitation, is not such a marriage with a lunatic, as is contemplated by the Revised Statutes to be valid, until annulled by a Court of Equity.

To establish a contract of marriage, there must be evidence of an intention on both sides to enter into a contract of that especial character.

An alleged marriage pronounced against because the proof was insufficient.

N. J. WATERBURY *and* H. W. ROBINSON, *for Petitioner.*
J. S. THAYER, *in person and by* F. W. GEISSENHAINER.

THE SURROGATE. The deceased died intestate, December 15, 1850. The petitioner applies for letters of administration, as his widow, and the application is contested by the Public Administrator, on the ground that the intestate died unmarried. The next of kin are aliens residing in

Germany. The case involves some novel questions of law, arising out of a singular state of circumstances.

The decedent was a German grocer; during his sickness, he lay in a room at the rear of his store, where he died. The petitioner was at the time, a widow, her husband having been dead some two years. Brautigam had, many years previously, in the life-time of her husband, boarded with her; after the decease of her husband, some degree of intimacy had sprung up between them, and five or six days before his death, she came to his apartment and continued to nurse and attend him assiduously, night and day, till he died. She claims, that in the night of Friday, December 13th, less than two days before he died, the decedent married her, in the presence of Cramer her son-in-law. Though there are circumstances favoring the idea that before his sickness, the parties may have individually contemplated marriage, there is nothing to show any understanding between them; and the evidence of Born establishes that after he fell into ill health, Brautigam declared he had no intention of marriage. The witness, Roe, who testifies to the intestate's expression of an intention to marry the petitioner, also says, that he was silent on the subject after he was taken sick. There was enough, however, in the previous relations of the parties, to make the idea of marriage the subject of delirious action.

The decedent's attending physician states, that he was attacked with inflammation of the lungs, a form of disease that frequently affects the mind; that "his mind was undoubtedly affected by his disease; also by his previous habits, and by the anodynes" he administered; that he found it necessary to give him active stimulants and opiates, but diminished the latter on learning they made him " flighty," " more delirious and watchful." He says, " when I first came into the room, he would almost always require rousing, but after I had given him a drink, and spoken to him, he would always recognize me; he was never so delirious he did not recognize me, when I aroused

him. He always knew who I was, and recognized me. He seemed to give intelligent answers." " I believe he would have got well, if it had not been for his previous habits of drinking. He drank so much that it made him nervous and approaching *delirium tremens*. He never had *delirium tremens*. During the last three or five days, he was threatened with *delirium tremens*. He was on the confines of it ; and that was my object in prescribing stimulants. He was at times actually delirious. He was a good deal so during the last three days." " He might have recognized me and still be in delirium." " He was more feeble on Saturday morning, and delirious at times." " On every occasion, when I roused him and asked him questions, he answered me intelligently. There may possibly have been times when he could not understand me. What I asked him about was his condition. I never had any other conversation with him, about other things." " His delirium did not show itself by any overt act, but by muttering and by partial stupor, which required rousing." " I should think his symptoms would likely be increased during the night." Roe, the colored man, who attended about the decedent's store, also testifies, that towards the close of his life, he was flighty at times, would pull the bed clothes, point to the ceiling, and talk mixed German and English, so as not to be understood. It also appears that on Thursday, a will having been prepared, Mr. Born, an intimate friend, who lived in the house adjoining Brautigam's store, refused to become a witness to it, believing him to be incapable of making a valid will. At that time, Born says, " he would recognize me, but he was flighty ; seemed to be winding up cord, hunting for his pocket ; uncovered himself, and said he wanted to get at his pocket." He also states, that on Friday, the petitioner told him the will had been brought there, to which he answered, " I said it was useless, as he was not in his right mind. She said she thought so too. She concurred in my opinion, that he was not competent to make a will, and was not in a condition to do so."

There is thus the evidence of Dr. Wilkes, Roe and Born, concurring to the establishment of delirium, towards the close of the decedent's illness ; and against this stands alone, the statement of the daughter of the petitioner, who visited the decedent frequently during his sickness, and says that when she was there, he was always in his right mind. The weight of testimony is overwhelming, and begets a presumption of great force against the capacity of the decedent to make any valid contract. Is this presumption removed, or disproved, by the facts that transpired upon the night the contract of marriage is alleged to have been made? But two witnesses testify to the actual state and condition of the decedent at that period, Mr. Cramer and Mr. Born ; and they both concur in showing an undoubted state of delirium. The presumption derived from previous circumstances, instead of being rebutted, is confirmed by direct evidence of his real condition. All the facts, therefore, are in harmony, were it not for Cramer's statement, that at the particular time of the alleged marriage, Brautigam's manner was composed, he spoke rationally and appeared to be quite rational. Upon this witness depends the whole proof of the alleged marriage ; he is the son-in-law of the alleged widow, and if he has any bias, it would naturally incline in her favor. A fair idea cannot well be had of this singular case, without giving the witness's own narrative of the event.

His first account on direct examination was this : "The deceased, about eleven o'clock at night, called her to his bedside, and told her he had something very important to communicate to her. She came forward,—he then asked her, whether she would marry him then? She answered, yes. He then called God to witness, before God and man, that they would be then man and wife, henceforth. He then asked her if she assented to it, and she said ' Yes, we are now man and wife.' They had hold of each other's hands at the commencement of it, until he called God to witness, when he raised his hands up, letting go of hers.

His manner was composed. When he raised his hands, he seemed to be earnest, as though he were imploring God to witness the ceremony."

On his cross-examination, this witness stated that he went to Brautigam's Friday night to sit up with him, at the request of his mother-in-law; he went between nine and ten o'clock. Mr. Born came in, and was there between ten and eleven o'clock, and the conversation between the decedent and his mother-in-law in regard to marriage occurred between eleven and twelve o'clock; decedent " had spoken to her before that, but not in reference to the subject of marriage." "He was quite flighty at times during the evening, before the ceremony, while I was there. He got out of bed, excited in a manner, and wanted to go into the store or into the yard, I won't be positive which." "When he got up, he talked Dutch part of the time, and I could not understand him. He talked or muttered to himself occasionally." "I should suppose he scarcely knew what he was about at that time. This I should think was somewhere about eleven o'clock. He then laid fifteen minutes or more in a doze. When he awoke after that he seemed to be quiet and tranquil, and appeared to be rational." "I think the time he jumped out of bed was after the ceremony. I think I sent in for Mr. Born while he was so excited. He did come in. I think it was about fifteen or twenty minutes after the ceremony, that he jumped out of bed; it may have been half an hour; and I think it was about one o'clock Born came in. I think I sent for Born immediately after he jumped out of bed." "Born might have come in, in about twenty minutes. Brautigam was in bed when Born came in, I think. I told Born Mr. Brautigam had been worse or wild, and I might possibly want him." "My mother-in-law mentioned to Born, when he came in, that if he had been there sooner he might have been to a wedding." Again, "I can't be positive as to the hour when the ceremony took place, it was somewhere about midnight."

"He called to her, first, and said he had something important to communicate.  She made no reply, but went up to him."  "He asked her if she would marry him then. He said their marriage had been put off a great while.  I don't recollect whether he said so shortly before this or at that time."  "I heard him ask her afterwards, whether now she was not his wife, and whether she did not consider herself as such.  She said 'Yes.'  He said, 'Eliza, you are my wife now, are you not?' she said, 'yes.'  It might have been three or four hours after the ceremony.  I think he said, 'What name shall I call you now?' or 'are you not my wife now?' she said, 'Yes;' and then at another time he said, 'What name shall I call you now? shall I call you Eliza, as usual?' she said, 'Yes.'  These were separate times, both after the ceremony.  At the ceremony his words were, 'Will you marry me now?'  He was then sitting up in bed, not supported by pillows.  He might have had his hand to rest upon.  She might have raised him up."  He said, 'Now before God and man we are man and wife, are we not?'  She assented, and said 'Yes, we are now man and wife.'"

Again, "The decedent said he wanted Mrs. Jaques to have half of his property, and the other half to go to his people in Germany.  This was after the ceremony; it might have been fifteen or twenty minutes, or half an hour after the ceremony"  "he commenced that conversation," &c.;  "this might have been two hours after the ceremony.  It was after he jumped out of bed.  It might have been full two hours.  I don't recollect the exact time. He spoke to her as if he supposed she would be entitled to one half of every thing he had."

Again, "It might have been fifteen to thirty minutes before the ceremony, that he was flighty.  He would pull the clothes, talk to himself, and seem troubled in his mind, and occasionally flighty."

Again, "I went there Friday evening between nine and ten.  He had spells of flightiness occasionally.  He had a

slight one about half past ten. He jumped out of bed at eleven, or a quarter or half past, somewhere about that time. The ceremony was performed a short time previous to that. It was two or three hours after the ceremony he said he wished her to have half his property. Mr. Born came in shortly after he jumped out of bed ; somewhere between twelve and one. He stayed an hour or so."

On the other hand, Mr. Born states that he went to the decedent's room Friday evening about seven o'clock, and sat there till about eleven ; Cramer came in about ten : " Brautigam seemed to be greatly excited ; he wanted to get up, and was very difficult to manage. I told them to send in for me if they could not get along with him. About one o'clock I was sent for. When I went into the room he was sitting on the bed, with his legs hanging out on the side. I asked them how he had been, and Mrs. Jaques said he had been continually so all night. They had had a great deal of trouble to manage him. I asked what drinks they had given. They said Port wine ; they had given him mostly wine. I stayed there till about five o'clock. \* \* After I went up and spoke to the decedent he recognized me. I persuaded him to lie down. He was out of his mind. He asked me if I would take a drink with him. I said yes. I put some porter in my glass, and his medicine was put in his glass. He would not take it, but wanted to get out some money to pay for the drink. When he got the taste of the medicine he would not take it. He was searching for his pockets to get the money to pay for the drink. I said the man had the money, it was paid for. He said, ' Yes, yes.' Sometimes Mrs. Jaques would stand before his bed, and he would talk German to her. She would tell him to speak English, so that she could understand him. \* \* From one to five o'clock he was constantly in the same state. He seemed to be flighty and out of his mind. After I came in at one o'clock, when he was lying quiet for a little while, Mrs. Jaques told me he had called her up to the bed, and had solemnly de-

clared her to be his wife ;" this " came out when she was speaking of how he had acted during the night, before I came in."

Laying aside for the moment the further consideration of the evidence, I propose to examine the law relative to the marriage contract, where one of the parties was of unsound mind at the time. Marriage, in its origin a contract of natural law, with the progress of society became a civil contract. Its very essence is mutual consent. *Quum ergo nuptiæ sint conjunctæ, consequens est, ut consensum utriusque accedere oporteat, excluso furore, vi, metuque.* (*Heinec. Elem. Jur. Lib.* 1, *Tit.* 10, § 148.) Independently of the mode of solemnization, and the various regulations adopted in different countries as to the performance of a valid ceremony, a unity of intention and consent has universally been considered, as well by the Canon Law, as by the local laws of all Christian nations, an essential to a valid contract.

Whether previous to the English marriage act of 1754, a contract of marriage *per verba de præsenti*, constituted a legal marriage at Common Law ; or whether a religious ceremony or public solemnization was essential to its validity, is a question of great interest. Mr. Roper, in the *Addenda* to his treatise on husband and wife, discussed the point very elaborately, and arrived at the conclusion, " that according to the law administered in England before the marriage act, a matrimonial contract, *de præsenti*, was essentially distinct from a marriage solemnized by a person in holy orders ; that it did not confer on the woman the right to dower ; on the man the right to the woman's property ; or on the issue the rights of legitimacy ; and that it did not render a subsequent marriage with a third person, *ipso facto* void at law, though it formed a ground for a sentence annulling it." (*Roper on Husband and Wife, p.* 474.) In *Dumaresly* vs. *Fishly*, 3 *Marshall's R.*, 368, the same view was taken of the effect of a mere contract by present words, in the able opinion of Justice Mills,

who contended that such a marriage was not sufficient to confer upon the parties the usual rights of property. The majority of the Court, however, ruled the other way. The whole subject of the institution of marriage recently received the fullest examination in the House of Lords, in the case of the *Queen* vs. *Mills,* 10 *Cl. & Fi.*, 534, and the research, learning, and ability, of the first Jurists of England, were exhausted in exposing the ancient sources of the matrimonial law, and tracing its devious stream through the practice, customs, and decisions of the Ecclesiastical and Common Law Courts, from the earliest period. Lord Chief Justice Tindal delivered the unanimous opinion of the Judges, "that by the law of England, as it existed at the time of the passing of the marriage act, a contract of marriage *per verba de præsenti,* was a contract indissoluble between the parties themselves, affording to either of the contracting parties by application to the Spiritual Court, the power of compelling the solemnization of an actual marriage; *but that such contract never constituted a full and complete marriage in itself, unless made in the presence and with the intervention of a minister in holy orders."* This opinion of the Judges as to what was the Common Law of England, was opposed by Lords Brougham, Denman, and Campbell, who maintained the opposite position; but Lords Lyndhurst, Cottenham, and Abinger coinciding with the Judges, the judgment of the Court below as to the invalidity of a marriage not solemnized before a minister in orders, was affirmed, by an equal vote. Nearly about the same time, the same question was considered by the Supreme Court of the United States, and the Justices being equally divided, no opinion was expressed. (*Jewell's Lessee* vs. *Jewell,* 1 *Howard,* 219.) This subject came before the Supreme Court of this State at an early period. In *Fenton* vs. *Reed,* 4 *J. R.*, 52, it was held that marriage may ordinarily be proved by cohabitation, reputation, acknowledgment of parties, and other circumstances. In *The People* against *Hum-*

*phrey*, 7 *J. R.*, 314, it was decided that confession of a previous marriage was not sufficient evidence on an indictment against the party for bigamy. In *Jackson* vs. *Claw*, 18 *J. R.*, 346, the doctrine of *Fenton* vs. *Reed* was adhered to and sanctioned. In *Jackson* vs. *Winne*, 7 *Wendell*, 47, a marriage solemnized before a magistrate was held to be valid, though not followed by cohabitation. In *Starr* vs. *Peck*, 1 *Hill*, 270, there was a public solemnization subsequent to the birth of a child, and it was decided that there was sufficient evidence of a previous marriage in fact, to go to a jury. In *Clayton* vs. *Wardell*, 5 *Barbour*, 214, there was an allegation of a marriage in fact, and proof of a subsequent actual marriage with another party, and the evidence of the first marriage was considered insufficient on the presumption the law entertains against the commission of crime. This judgment was affirmed by the Court of Appeals upon the same ground. Several of these cases turned on the simple question of what is sufficient evidence of marriage, and not what is sufficient to constitute a marriage. Jackson and Winne decided that cohabitation was not necessary to the validity of a marriage in case of a public celebration, and Starr and Peck that where there was cohabitation, public celebration was not essential. But there is not a solitary case in our books where the marriage was held to be valid, unless there was either cohabitation, or solemnization before a magistrate or minister. I have not met with a decision establishing a marriage on proof of a private contract, unconnected with either previous or subsequent cohabitation. It is not to be denied, however, that the Courts in pronouncing judgment have incidentally recognized the doctrine that no formal solemnization of marriage is requisite by the Common Law, that a contract of marriage *per verba de præsenti*, was as valid as if made *in facie ecclesiæ*; and that a full, free, and mutual consent between parties capable of contracting, is sufficient to constitute marriage, though not followed by cohabitation. These

opinions were based upon the supposed rule of the Common Law, in this respect conceived to be coincident with the ·Canon Law, that, as stated by Poynter, " a contract *per verba de præsenti*, that is to say, between parties entering into a present agreement to become husband and wife ; or a promise *per verba de futuro*, which was an agreement to become husband and wife at some future time, if the promise were followed by consummation, constituted marriage without the intervention of a priest ; for the contract *per verba de præsenti* was held to be a marriage complete in substance, but deficient in ceremony ; and though the promise *per verba de futuro* of itself was incomplete in both points, yet the cohabitation of the parties, after exchanging the mutual promise, implied such a present consent at the time of the sexual intercourse as to complete the marriage in substance, and give it equal validity with the contract *de præsenti*." (*Poynter on Marriage and Divorce, p.* 15.) If this proposition be true, it may well be the subject of anxiety and apprehension, that a contract of such infinite consequence to the order and well-being of society, and the security of the rights of property, has been left, in regard to the evidences of its existence, in so loose and uncertain a condition. The policy ought seriously to be considered, of permitting the formation of an indissoluble contract of the most sacred character,—the certainty of which lies at the very foundations of social peace and virtue,—without requiring such a formal solemnization as may secure the unequivocal demonstration of the marriage. The Statutes of Frauds and of Wills regulate contracts and transactions of much inferior moment, by requiring certain acts to be performed or signified in a certain mode, and established by certain evidences. And yet the matrimonial contract is left, as regards the proof of its formation or existence, in this most dangerous condition. (2 *Kent's Com., p.* 74 ; *Story's Conflict of Laws, c.* 5 ; See *Bright's Husband and Wife, by Lockwood,* 1, *p.* 10, *note.*)

If the rule of the Canon Law is to be adopted in all its consequences, then a mere private contract, without the parties ever having lived together, must for all civil purposes and in regard to the rights of property, be regarded as a lawful marriage. Such a marriage may be brought about for *quasi* testamentary purposes, without the protection against fraud or artifice, that usually attends public celebration, and the property which could not pass by will, except through the medium of certain solemnities, be disposed of by a verbal contract, proved by a single witness. And if the idea which I shall shortly consider, that the marriage of a lunatic is only voidable and not void, be sound, the consequences may be still more disastrous.

Regarding marriage, however, simply as a contract, it would seem to follow from the very nature of the thing, that the deliberate consent of the parties being necessary, lunacy or mental incapacity is an impediment to matrimony. In *Ferlat* vs. *Gojon, Hopkins' R.*, 478, the marriage was procured by fraud, artifice and duress, though solemnized by a clergyman. The Chancellor said, "Upon the facts of this case there can be no doubt, that this marriage would be treated as null by every Court of this State, in which its validity might be incidentally drawn into question. The Courts of law may try and decide this question in any of the actions or proceedings which belong to their jurisdiction; such as prosecutions for bigamy, actions of dower, suits in which marital rights are claimed, or any other proceeding involving the legality of the marriage. But a Court of Law, in any of these proceedings, pronounces the marriage valid or void, only for the purpose of deciding the particular suit in which the question arises." In *Wightman* vs. *Wightman*, 4 *J. C. R.*, 343, Chancellor Kent held, that the marriage of a lunatic "was absolutely void," "at Common Law and by the law of reason," citing the maxim of the civil law, *furor contrahi matrimonium non sinit, quia consensu opus est* (*Dig.* 23, 2, 16, 2), and adding, "it is too plain a proposition to be questioned, that

idiots and lunatics are incapable of entering into the matrimonial contract." In *Bunning* vs. *Reane*, 2 *Phill.*, 69, Sir John Nicholl says, " Modern resolutions have adhered to the reason of the civil law, that want of reason must of course invalidate a contract, and the most important contract of life, the essence of which is consent." In *The Inhabitants of Middleborough* vs. *Rochester*, 12 *Mass. R.*, 363, a marriage with an idiot was held absolutely void. This was undoubtedly the rule of the Civil, Canon, and Common Law. *Quia alii contractus non fiunt nisi mutuo consensu, ergo fortiori, matrimonium.* (*Sanchez, De Matrim. Disp.*, 25.) Lunacy or mental incapacity, or a want of a competent share of reason, has always been ranked among those impediments to marriage, which rendered the pretended contract null and void altogether, in contradistinction to such impediments, as made a contract only voidable. Mental incapacity stood on the same ground as a prior existing marriage. (*Poynter on Marriage and Divorce, pp.* 84, 146, 147, 154.) Such a want of reason or volition, as amounts to an incapacity to consent, must inevitably prevent a contract.

But it certainly cannot be necessary to give authority for a principle so consonant with reason, as that insanity vitiates all acts,—that without soundness of mind there can be no legal consent,—the consent of a free and rational agent being an essential ingredient to render any contract valid. (*Countess of Portsmouth* vs. *Earl of Portsmouth*, 1 *Hagg.*, 355.) An insane person can no more dispose of his person and property, by the matrimonial contract, than by any other contract. (2 *Phill.*, 69.) Now, the difference between void and voidable acts, is so important, that it lies at the very foundation of the rights of parties, in a case of this kind. A marriage only voidable, could not, at Common Law, be rendered void after the death of either of the parties. *Canonical* disabilities, such as consanguinity, affinity, &c., only made the marriage voidable and not *ipso facto* void, but the marriage was esteemed valid

for all civil purposes, until sentence of nullity was obtained; but " *civil* disabilities, such as a prior marriage, want of age, idiocy and the like, make the contract void *ab initio*, not merely voidable. These do not dissolve a contract already made, but they render the parties incapable of contracting at all; they do not put asunder those who are joined together, but they previously hinder the junction, and if any persons under these legal incapacities come together, it is a meretricious and not a matrimonial union, and therefore, no sentence of avoidance is necessary." (*Sir John Nicholl, in Elliott* vs. *Gurr.*, 2 *Phill.*, 16, 19; *Hemming* vs. *Price*, 12 *Mod.*, 432.) " The principal thing required to a legal marriage," says Ayliffe in his *Parergon*, 361, " is the consent of the parties contracting, which is sufficient alone to establish such a marriage." In all divorces *a vinculo*, " the marriage was not *de jure* according to the canonists, because it was void, *ab initio ;*" " the sentence of divorce in such cases, is only declaratory, that the marriage is dissolved, for it was absolutely void before, and either of the parties might marry again, though the other was living." (*Id.*, 229.) In harmony with this rule, upon an application for administration on the estate of a deceased woman, by a person claiming to have been her husband, the Ecclesiastical Court denied the application, on the ground, that at the time of the solemnization of the marriage, the deceased was incapable from mental deficiency, of contracting a marriage. (2 *Phill.*, 69; *Aughtie* vs. *Aughtie*, 1 *Phill.*, 201.)

I have dwelt more on this point, than at first sight it would seem to demand, in consequence of the position taken by the counsel of the alleged widow, that the Revised Statutes of this State establish a different rule ; that they make the marriage of a lunatic voidable, instead of void ; render it valid for all civil purposes until dissolved by a Court of competent jurisdiction, in the lifetime of both the parties, or after the death of either, on the application

of heirs or next of kin. This is a grave and startling proposition.

There can be no dispute, that in reporting to the Legislature the important chapter on " the Domestic Relations," one of the objects of the Revisers was, " to define the requisites essential to a marriage, and the cases in which it is void or voidable ;" as well as to prevent " fraudulent and clandestine marriages, by prescribing the evidence by which alone marriages can be established" (3 *R. S.*, 2*d ed.*, *p.* 659). Though the provisions reported to and enacted by the Legislature, commenced by declaring that " Marriage, so far as its validity in law is concerned, shall continue in this State a civil contract, to which the consent of parties capable in law of contracting, shall be essential" (2 *R. S.*, 3*d ed.*, *p.* 199, § 1) ; yet the succeeding sections prescribed how this civil contract should be made, and required *all marriages* to be solemnized in a certain manner, " with a view to prevent abuses ; to furnish the means of proving marriages ; and to authenticate and preserve such proof." Though these provisions were enacted, yet almost immediately after the statute went into effect, it was declared by the act of 20th April, 1830, that the solemnization of marriage need not be in the manner prescribed in the Revised Statutes. This change affected very materially the congruity of the system. Having provided for the public solemnization of marriage, the Revisers reported provisions for its public dissolution, and in doing so, made important changes in the law. The second Section of the statute (2 *R. S.*, *p.* 199) declares incestuous marriages absolutely void ; the 4th and 5th provide the same with regard to second marriages, except in certain cases. The third Section declares, that " when either of the parties to a marriage shall be incapable, for want of age or understanding, of consenting to a marriage, or when the consent of either party shall have been obtained by force or fraud, the marriage shall be void from the time its nullity shall be declared by a Court of competent authority." There is

some distinction between this phraseology, and that of the fifth Section, which declares certain second marriages void, " *only*" from the time of sentence of nullity.   The latter section, renders the marriage in question valid until formally annulled ; the former section does not exclude the idea, that the marriage therein referred to may be void, before sentence of nullity.   Still candor compels the admission, that a just interpretation of the whole statute, as originally enacted, shows a  distinction sought to be established between certain marriages as void, and others as only voidable.   And with this agrees the Revisers' note to Section 3 (*Orig.*, § 4) ;  " Some of these marriages are absolutely void by the existing law.   But it is believed that the interests of society and of the parties concerned, will be best promoted by placing them on the ground stated in this section."   (3 *R. S.*, 2*d ed.*, *p.* 660.)   By the 25th Section (2 *R. S.*, *p.* 202), " a marriage sought to be annulled on the ground of the lunacy of one of the parties, may be declared void at any time during the continuance of that lunacy, or after the death of the lunatic in that state, during the lifetime of the other party to the marriage, on the application of any relative of the lunatic interested to avoid the marriage."   Now, as the term lunatic applies by the statute "to every person of unsound mind, other than idiots" (§ 29), it seems to be the effect of this section, that after the death of the lunatic " *in that state*," the marriage can be annulled *only during the life-time of the other party ;* that if both parties die, *it can never be annulled ;* and that if a party who was a lunatic at the time of the marriage, happen to die *in a lucid interval*, it could not be dissolved, even during the life-time of the other party.   It also appears by Section 36, that a sentence of nullity, if pronounced during the life-time of the parties, shall be conclusive evidence of the invalidity of the marriage, in all Courts and proceedings ; but if pronounced after the death of either of the parties, shall be conclusive only as against the parties in the suit, and those claiming under them.

Whatever may be thought of these provisions, where in addition to the solemnization of the marriage, the parties have cohabited, and issue have been born, their bearing upon a mere private contract of marriage, not followed by cohabitation, may be most disastrous, supposing such a contract sufficient to make a valid marriage. For example, if, in the present case, I should be satisfied that Brautigam, at the time of the alleged marriage, was a lunatic, or in consequence of delirium incapable of contracting, and yet that he died in a lucid interval, there is no human power capable of dissolving the supposed contract, or pronouncing its nullity, provided these sections of the statute be applicable to a case of mere contract. And the same result would ensue, provided the lady claiming to be the widow of the deceased, were now to die. Marriages by force are put upon a similar footing, as voidable, and if by design or accident, the parties should decease, the mere consent, extorted by violence, without subsequent cohabitation, would make an indissoluble marriage, upon the construction sought to be given to this statute. Such cases are not improbable. In *McAdam* vs. *Walker*, 1 *Dow.*, 148, the man shot himself the same day he declared the woman to be his wife; but he was held to have been sane at the time of the marriage. In the present instance, the decedent died two days after the event. It is incontrovertible, that the portions of the statute under discussion, were framed in connection with provisions which required a prescribed mode of solemnization, that in all probability would prevent such cases as I have suggested; that the marriage contemplated, was a marriage publicly solemnized, and not a mere private contract by present words, without subsequent recognition, cohabitation or other consequences. A marriage duly solemnized according to a prescribed mode, would have about it a certain form, appearance and external character, especially if followed by cohabitation, so as to give a color of marriage, and justify or require its formal dissolution. But a mere exchange of

words, privately, without a single additional act, is a very different thing. The latter, at the best, is but a contract, the former has the external indications of entering into the state of marriage. In saying that marriages contracted through menace or fear, are void *ipso jure*, Ayliffe adds, " for marriages contracted against the will of either of the parties, are usually attended with very bad and dismal consequences, and therefore, all statutes and decrees made against this liberty of the parties, are null and void in their own nature." (*Parergon*, 361.) The consentaneous judgment of all jurists, is against the possibility of a lunatic making any contract. (*Puff. L. Nat.*; *Grot. Bel. P.*; *Greg. L.* 4, *Tit.* 1, *c.* 29; *Bl. Com.*, 1, 438; *Kent's Com.*, 2, 75; *Paley*, 1, 142; *Stock on Non Comp.*, 16; *Collinson on Lunacy*, 1, 376, 554.) It is repugnant to reason and nature, that an agreement which implies consent, capacity, intention,—a *mind* to make it,—can be created by the Legislature, so as to be obligatory on a man who has no mind. The basis, the first element of a contract is wanting, and from the very constitution of things, cannot be given by human power. The very definition of marriage by our statute, is " a civil contract, to which the consent of parties *capable* in law of contracting, shall be *essential*." It is a contradiction in terms to say, that " a civil *contract*, to which the *consent* of parties *capable* in law of contracting, shall be *essential*," may be valid, when the very thing declared to be *essential* is wanting; when there is *no consent*, *no capacity* as to one of the parties. If consent and capacity be *essential*, they cannot be *non-essential*. Where there is no capacity, there can be no contract, no marriage, nothing to annul or dissolve. Where cohabitation has ensued, the lunatic may be living in an apparent state of marriage, justifying the intervention of a Court to pronounce sentence of nullity; the same may be said of a public solemnization; but in the case of an alleged contract by present words, standing alone without a solitary circumstance in addition indicating an entrance into the mar-

riage state, where the marriage is sought to be established upon mere words uttered in private, if one of the persons be a lunatic, the transaction is no marriage ; it is a palpable nullity, there is nothing for a Court to dissolve or avoid.   I think it inconceivable that such consequences were intended or anticipated by the repeal of so much of the marriage act as required marriages to be publicly solemnized ; and there can be no doubt, that the marriages referred to in these sections relating to the marriages of lunatics, were such as at the time of the original passage of the act, were required to be celebrated in a prescribed manner, and not mere contracts by present words privately interchanged between the parties.   If the provisions making the marriages of lunatics voidable and not void, were therefore originally designed to apply to marriages solemnized in a certain way, were they, by the repeal of so much of the law as required all marriages to be celebrated in that way, made applicable to private verbal contracts ? Is that a just mode of interpreting a statute ?   In view of the fact, that the manner of publicly solemnizing marriage and securing the evidences thereof, still remains in the statute as a mode permitted, if not recommended to parties, I think it very reasonable to construe the provisions relating to the dissolution of the marriages of lunatics, as applicable, in consonance with the original design of the statute, only to such marriages.   If I found it necessary, therefore, to decide this case upon the statute, I would not be willing to hold that the form of a private contract of marriage by present words, with a lunatic, without any preceding or succeeding act indicating an entrance into the marriage state, is such a marriage as the Legislature intended should be valid, until pronounced null by a Court of Equity.   But I do not think, that the circumstances of this case require from me the decision of that interesting question.   I have no doubt that the decedent, at the time of the alleged contract, was incapable of making it.   The evidence shows, that shortly before and shortly after the event,

he was in a state of stupor, with occasional fits of delirium. This appears from the testimony of Cramer and Born, is corroborated by the evidence of Roe, and of his physician, as to his previous and subsequent condition, and cannot be reasonably questioned. This establishes such a general condition of mind, as to require very clear proof of his perfect intelligence at the moment the pretended contract is said to have been made. The presumption is against his having then been rational. The presumption must be removed. Proof of calmness at the instant is not sufficient to rebut it, where delusions, and *indicia* of derangement have appeared shortly before, as well as after the act. (*Groom* vs. *Thomas*, 2 *Hagg.*, 433.) A person who can understand and answer questions, and recognize friends, may still be incapable of making a contract. (*Marsh* vs. *Tyrrell*, 2 *Hagg.*, 87.) Insanity or delirium, is perfectly consistent with those and the like acts.

The decedent then was in this condition of mind, and as to bodily health, he was on his death-bed. His mental, if not his physical state, is an important element in determining what construction is to be given to the acts of other parties. Cramer, the witness of the alleged marriage, says of the decedent, " he was quite flighty at times during the evening, before the ceremony, while I was there." Born concurs in this, and says Brautigam " was greatly excited," "wanted to get up," and " was very difficult to manage ;" " he wanted to uncover himself and get up. I told them to send in for me, if they could not get along with him." Now upon the supposition that Mr. Cramer correctly recounts what occurred, the man in this condition suddenly sits up in bed, calls the person nursing him, asks her if she will be his wife, she assents, and he declares her before God and man to be his wife. This transaction takes place in the watches of the night, before a solitary witness. According to one of Cramer's several statements, a few minutes after, the man jumped out of bed, and was so ungovernable, that they were compelled to

send in for Born. On the side of the decedent, the mind to contract marriage was wanting. But what is the natural presumption in regard to the other party? Are her acts to be construed, in reference to her then present capacity, as the nurse of a delirious man, or can she be supposed to have deliberately intended marriage, without imputing to her the immediate conception of a base and sinister design? Did she mean by that act to enter into a sacred and solemn contract; was she so skilled in law as to know the possible effect of such words; or is there any other natural or reasonable construction to be given to her conduct, than to consider such assent as she gave, as that quieting kind of assurance which leads the attendant at the bedside of a delirious person, to calm his mind by acquiescence? The circumstances must be such as "to show an intention on *both* sides to enter into a contract of that especial character." (*Lord Cottenham in Stewart* vs. *Menzies*, 8 *Cl. & Fi.*, 309; *Honyman* vs. *Campbell*, 2 *Dow & Clark*, 281; *Hamilton* vs. *Hamilton*, 9 *Cl. & Fi.*, 327.) Is there any evidence or even presumption that at the time she intended to enter into the marriage state? No previous deliberation or conversation on the subject of marriage is shown. The decedent had been sick for several weeks; she had attended him five or six days, and if the matter were seriously contemplated on either side, it is singular that nothing should have transpired indicating it. Again, how did she treat the circumstances that occurred? When Mr. Born came in to aid in the management of the decedent, she told him "if he had been there sooner, he might have been to a wedding;" and the next morning, when the Doctor came, and asked what kind of a night decedent had, she answered, "Oh, we have had a marriage here last night." The Doctor says "this was a mere passing remark. It did not appear to be made in joke;" "it was so cursory I did not think of it again." There is certainly nothing in this but the narrative of an attendant; it is mere description, not a formal claim of marriage.

The further we proceed from the period of the occurrence, the more time was given for deliberation, and the probability of having the first, fresh, and genuine impressions of the party diminishes. Mrs. Moulton, a witness called by the applicant, testifies that on Sunday afternoon after the decedent's death, the petitioner stated that decedent "had married her, himself," and on being asked whether she thought such a marriage would stand in law, answered that "she did; she had asked a lawyer, and she thought it would stand in law. The lawyer had said so." How this advice was obtained, whether or not through her daughter who visited her at Brautigam's room twice on Saturday, is not very material, but the fact of her having taken the opinion of counsel, before such public acts as unequivocally expressed her intention to regard it as a valid marriage, necessarily detracts from the force of the inference sought to be deduced from those acts.

Nor in testing her intention, and the light in which she regarded the circumstances, is it to be overlooked that the usages of society ordinarily call for another mode of celebrating marriage; and when a contract alleged to have been made in so unusual a manner,—and if valid, having such serious consequences,—is advanced as the basis of important rights, it cannot escape remark, that during the decedent's life, she made no attempt to urge the matter upon his attention, or have such mode of celebration as is customary. Indeed, there is not a particle of reliable evidence to show that the decedent knew or supposed the petitioner to be his wife, or that she claimed so to be. There is no satisfactory proof that he was in his right mind at any time during Friday night, and no weight, therefore, attaches to his conversations as reported by Mr. Cramer. When the petitioner said in the presence of the Doctor the next morning, "Oh, we have had a marriage here last night," it does not appear the decedent heard or understood the remark. The Doctor expresses the opinion that he did not. And on Saturday afternoon, when the peti-

tioner and her daughter conversed about the marriage, though, as stated by Mrs. Cramer, the decedent "looked up and smiled," considering the state of his body and mind, and the absence of any facts indicating intelligence, I am not satisfied he understood what was said.  To marry a man on a look or a smile would be dangerous, even in a case of undoubted capacity.  For aught that appears, the decedent died without the slightest idea of his alleged marriage. The result is, that we are confined to the circumstances and facts that occurred on the Friday night preceding the decedent's death, without having any assistance from what subsequently transpired to aid in the interpretation and construction of those events.  And then, in view of the state of the decedent's mind, the capacity in which the petitioner was attending him, and all the concurrent circumstances, is it reasonable to suppose that she intended a compact of marriage when the decedent spoke to her about marriage?  It seems to me the fair legal presumption is, that a person dealing with a man in delirium attaches no serious importance to his acts ;  and that the conduct and acts of an attendant at the sick bed of one in such a condition, are to be referred to the character and capacity in which the party is there.  If all that is stated by Mr. Cramer, therefore, be accurately narrated, I cannot infer from the petitioner's acts at the time an intention to contract present marriage.  If she subsequently took counsel upon the effect of those occurrences, and was advised that they made a legal marriage, that, as an afterthought, could not have a retrospective effect.  The intention to contract marriage must be mutual ;  the decedent had no consenting, contracting mind ;  the petitioner's intention to contract, is not inferrible from the circumstances, and the proof, therefore, fails.

Again, nothing is pretended in this case except the mere parol contract.  There was no cohabitation.  The helpless man was on the borders of the grave, his nurse or attendant, on the evidence of her son-in-law, claims a solemn

contract to have been made at midnight, by means of which she virtually becomes entitled in this case to the whole of his personal estate, if the claim be established. Is it requiring too much, to say that acts and circumstances having such a result should be established with certainty, especially when the legal determination of marriage or no marriage depends much upon the precise words spoken? " It is easy to conceive," said Lord Campbell in *The Queen* vs. *Millis*, " that parties might contract *per verba de præsenti*, without meaning instantly to become man and wife." " The contract *per verba de præsenti*, only constitutes marriage when the parties intend that it should do so without any subsequent ceremony." There are some discrepancies in the testimony which I cannot reconcile,—such as Mr. Cramer's reference to the gold watch,—the gift of which the Doctor puts at an anterior date,—the statement given by Mrs. Moulton of the occurrences of that night, as narrated to her by the petitioner, which by no means agrees with Mr. Cramer's account,—and especially Mr. Cramer's confused and contradictory recital of what transpired. In saying this, I do not mean to impute to him intentional departure from the truth. I have no doubt that something was said by the decedent on the subject of marriage. But what it was,—what were the precise words used,—what acts of the decedent preceded or succeeded it,—what was the conduct and conversation of the petitioner,—are all important; and for some reason or other, this witness fails to give such a lucid narrative as the nature of the case requires. A single perusal of his evidence is sufficient to indicate this palpably. Uncertain, loose, and unsatisfactory as evidence of conversations and parol declarations is generally, such testimony is to be received with the greater caution, where the consequences depending upon it, are weighty,—where the transaction in question is of an unusual and extraordinary character,—the witness is a near connection of the party in interest,—where the exact words used are of vital importance,—and in fine, the witness

from some cause or other, defective memory, confusion of ideas, or mere blundering, has not succeeded in establishing confidence. For these reasons I think the evidence of Mr. Cramer not sufficiently clear, consistent, and satisfactory to sustain the alleged contract of marriage.

In conclusion, if a mere private agreement of present marriage, without cohabitation, is by the Common Law, or by the law of this State, a valid marriage, I still feel compelled to pronounce against the claimant for the several reasons, First, that a lunatic is incapable of making such a marriage contract, and that it is competent for any Court where the validity of it is incidentally involved, to treat it as a nullity ; Secondly, that the presumption arising from all the circumstances is against the claimant intending at the time to enter into a present marriage ; and lastly, that the evidence is not sufficiently clear, in fact, to establish the form of a marriage contract between the persons. The petition must, therefore, be dismissed, and letters be issued to the Public Administrator.